FILED
IN CLERKS OFFICE
2017 NOV -9  PM 1: 12
U.S. DISTRICT COURT
DISTRICT OF MASS.

# FEDERAL DISTRICT COURT
## WESTERN MASSACHUSETTS DISTRICT
### (SPINGFIELD, MASSACHUSETTS)

| | |
|---|---|
| **Rinaldo Del Gallo, III**<br>Plaintiff, | ) <br> ) <br> ) <br> ) |
| v. | ) <br> ) <br> ) |
| **Boston Mayor Marty Walsh**, in his personal and professional capacity | ) <br> ) <br> ) |
| **Boston Police Commissioner William B. Evans**, in his personal and professional capacity | ) <br> ) <br> ) <br> ) |
| **Boston Parks and Recreation Department Commissioner Christopher Cook**, in his personal and professional capacity | ) <br> ) <br> ) <br> ) |
| **An unknown Boston Police Officer with badge number 2578**, in his personal and professional capacity | ) <br> ) <br> ) |
| **An unknown Boston Police Officer with badge number 16**, in his personal and professional capacity | ) <br> ) <br> ) |
| **Boston Police Officer Captain Greeland**[1]<br>Badge Number 10 | ) <br> ) <br> ) |
| Any one of approximately 300 Unnamed John and Jane Doe Police Officers at the Boston Free Speech Rally manning the gates or on the grounds or who interacted with Rinaldo Del Gallo, that would not allow Rinaldo Del Gallo in to speak despite being asked to be allowed into speak, or any supervising Police Officers, in their personal and professional capacities, whose names will be determined in discovery. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| The City of Boston | ) <br> ) |
| Defendants | ) _ <br> ) |

**AVERRED COMPLAINT**

**AND REQUEST FOR INJUNCTIVE RELIEF**

**REQUEST FOR PRELIMINARY INJUNCTION**

**A JURY TRIAL IS REQUESTED**

---

[1] The spelling of "Greeland" is a guess.

1

2

3

4

I, Rinaldo Del Gallo, hereby testify under pains of perjury that all of the following facts are true or believed to be true, all of the following beliefs are believed to be true, and all of the following statements of law are beliefs believed to be true:[2]

Rinaldo Del Gallo, III          November 7, 2017

6

7

## **Summary of the Action**

8

9

10

11

12

13

14

1. This is a lawsuit under 42 USC § 1983 and any implied causes of action under the US Constitution against the Mayor of the City of Boston, the Police Commissioner of the City of Boston, the Boston Parks and Recreation Department Commissioner, and the Boston Police officers described above who:

15

16

17

   a. refused to allow me, an invited speaker, to speak the at the Boston Free Speech Rally held at the Parkman Bandstand on the Boston Commons, on Saturday, August 19, 2017, thus depriving me of my constitutional right to speak despite repeated requests presented to countless police officers manning the gates, on the grounds, or who worked at the 911 dispatch to allow me to enter and speak; and

18

19

20

   b. refused to allow those that wanted to attend the Boston Free Speech Rally and were not protestors[3] (the rally attendees) to appear within any distance where the speakers could be heard, thus violating my constitutional right to speak and be heard and my constitutional right to assembly; and

21

22

   c. refused to allow sufficient amplification from Parkman Bandstand thus violating my right to speech and the corollary right to be heard; and

23

24

25

26

27

28

---

[2]While this document is a complaint, it also serves as a supporting affidavit because it is made under pains of perjury.

[3] The Boston Free Speech was not a "protest" but rather a rally celebrating the First Amendment. As such the people that supported the rally or who wanted to hear them speak will be called "rally attendees." Those that opposed the rally will be called "protestors." The often-used nomenclature "counter-protestor" to describe those that were opposed to the rally used by the media implies that Boston Free Speech rally was a "protest," justifying the label "counter-protest" for its opponents. A "counter-protest" requires a protest to counter; but there was no "protest" to "counter-protest." The correct terminology would be a rally (and "rally attendees") and protestors of that rally ("protestors").

> d. refused to allow the media within the Parkman Bandstand or anywhere sufficiently near it to hear those that were speaking, thus violating my constitutional right to speak and be heard.

2. This is a lawsuit under 42 USC § 1983 and any implied causes of action under the US Constitution against the Mayor of the City of Boston, the Police Commissioner of the City of Boston, the Boston Parks and Recreation Department Commissioner, and the Boston Police officers described seeking injunctive relief, including a permanent injunction and a preliminary injunction order the defendants to:

> a. Order the Commissioner of Boston Parks and Recreation to provide a permit for a "Resist Marxism,[4] Rally for the Republic" scheduled to be held on November 18, 2017 as originally requested (there was no conflict when originally requested) and not the following day.

> b. Order that the defendants to allow all speakers, including myself, to speak and not in any way be interfered with while speaking or making a presentation on November 18, 2017, or any rally or presentation thereafter.

> c. Order that the defendants to allow all speakers, including myself, to enter the Parkman Bandstand and not be barricaded from rally attendees that want to hear the speakers so that the attendees cannot hear the speakers on November 18, 2017 or any date thereafter.

> d. Order the defendants, to allow the plaintiff (Rinaldo Del Gallo, III) an invited speaker, to speak at the "Resist Marxism, Rally for the Republic" event to be held at the Parkman Bandstand on the Boston Commons, on November 18, 2017 and allow media to cover the event so that they can hear the speakers, said media coverage to be handled in the manner decided by the organizers of the event.

> e. Order the defendants, to allow the plaintiff (Rinaldo Del Gallo, III) an invited speaker, to the Rally to be held at the Parkman Bandstand on the Boston Commons, on November 18, 2017 (or if not at the Parkman Bandstand on the grounds of the Boston Commons) and allow media to cover the event so that they can hear myself and the other speakers.

---

[4] While I am progressive, the members of the event want me to speak for championing the First Amendment.

f.  Order the defendants, to take all necessary measures to allow the organizers of the "Resist Marxism, Rally for the Republic" event to amply their speech at such a volume as to overtake any attempt to drown out the event, and moreover, to order the police to stop the amplification of any sound that has the effect of drowning out the speakers, and to allow amplification at future events.

g.  Order the defendants, to take all necessary measures to allow the organizers of the "Resist Marxism, Rally for the Republic" event to amplify their speech sufficiently so that they make be heard over the amplified or non-amplified sound of protestors.

h.  Order the defendants to not prevent Rinaldo Del Gallo from speaking at any future event in which he is invited to speak.

i.  Order the defendants to not interfere with media coverage of any event where Rinaldo Del Gallo may be a speaker, including the Rally for the Republic event on November 18, 2017.

j.  Order the defendants to never again interfere with a rally, speech, or forum so that the media cannot hear what the speakers are saying and cover the event.

## The Parties

3.  My name is Rinaldo Del Gallo, III and my mailing address is PO Box 1082, Pittsfield, MA 01202-1082.

4.  I am a progressive who:

a.  ran for State Senate as a "Bernie Sanders Progressive," filed petitions for ordinances in the City of Pittsfield that arguably could be called a "sanctuary city" ordinance (that did result in a "Policy 413" to protect the immigrant community; and

b.  filed petitions for transgender rights in public facilities in the City of Pittsfield, filed petition in the City of Pittsfield leading to protections for farm animals (to give them enough room to turnaround); and

c. filed petitions in Pittsfield and "Citizen's Petitions for Warrant Articles on Town Meetings" that resulted in bans on Styrofoam and single-use plastic bags throughout Berkshire County; and

d. have written newspaper columns supporting numerous progressive causes.

5. While I am progressive I strongly support free speech and have been involved in a number of court cases involving freedom of expression including;

a. A successful lawsuit to allow the Berkshire Fatherhood Coalition have a music festival that was in support of shared parenting legislation, where the City of Pittsfield was price the Berkshire Fatherhood Coalition out of the marketplace of ideas by requiring the Berkshire Fatherhood Coalition to pay for an unaffordable police detail.

b. An unsuccessful lawsuit to allow me and others to continue to gather signature at the Pittsfield Post Office, a practice that had gone on for time immemorial.

c. A successful lawsuit to lift a "criminal harassment protection order" that prevent blogger and journalist Dan Valenti from commenting on a crime that had taken place in the City of Pittsfield.

6. Given my political views and my history fighting for the First Amendment and freedom of expression, I was invited by John Medlar (one of the organizers) to speak at the Boston Free Speech Rally that was held on August 19, 2017; I accepted that invitation, came to Boston, and punctually arrived expecting to speak.

7. The defendant, Marty Walsh, is currently the Mayor of Boston, and he is being sued in both his personal and professional capacity.

8. According to campaign records, Mayor Malty Walsh's address is 2 Butler Street in Boston, Massachusetts, and that is the address that he is using for his reelection campaign.

9. Commissioner William B. Evans is the Police Commissioner for the City of Boston, and he is being sued in his personal and professional capacity.

10. The Boston Police Commissioner is the Executive Head of the Police Department and is responsible for the management, planning, direction and control of the Police Department.

11. The Office of the Boston Police Commissioner is at Boston Police Headquarters, One Schroeder Plaza Boston, MA 02120.

12. Mr. Christopher Cook is the Commissioner of the Department of Parks and Recreation of the City of Boston and he is being sued in his personal and professional capacity.

13. According to the City of Boston's website, "[The Commissioner of the Boston Parks and Recreations Department]" and his colleagues at BPRD oversee more than 2,600 acres of neighborhood parks, playgrounds, tot lots, athletic facilities, city squares, urban wilds, and Boston's street trees."

14. It through the Boston Parks and Recreation Department that one can apply for a permit to use the various parks in Boston, including the Parkman Bandstand at Boston Common.

15. The Commissioner's Office for the Boston Parks and Recreation Department is located at 1010 Massachusetts Ave, Boston, MA 02118.

16. An unknown Boston Police Officer with badge number 2578, in his personal and professional capacity, who gave his name on a video I took by my cell phone, but refused

admittance for me to speak at the Boston Free Speech Rally—it is expected to get his name during discovery. He is being sued in his personal and professional capacity.

17. An unknown Boston Police Officer with badge number 2578, in his personal and professional capacity, who gave his name on a video I took by my cell phone, but refused admittance for me to speak at the Boston Free Speech Rally—it is expected to get his name during discovery. He is being sued in his personal and professional capacity.

18. Boston Police Officer Captain "Greeland," Badge Number 10, whom I video tapped on my cell phone, but I may have the spelling of his name wrong—it is expected to get the correct spelling of his name during discovery. He is being sued in his personal and professional capacity.

19. Numerous members of the Boston Police Department who would not let me in to the Parkman Bandstand refused to provide their badge numbers when I asked in an effort to maintain their anonymity.

20. I am also suing "Any one of approximately 300 Unnamed John and Jane Doe Police Officers at the Boston Free Speech Rally manning the gates or on the grounds or who interacted with Rinaldo Del Gallo that would not allow Rinaldo Del Gallo in to speak despite being asked to be allowed into speak, or any supervising Police Officers, in their personal and professional capacities." –it is expected that I will be able to obtain their names during discovery.

21. I am also suing the City of Boston as a municipality.

The City of Boston as a Party

22. The previous paragraphs are incorporated by reference.

23. "Federal law makes governmental defendants that are not arms of the State, such as municipalities, liable for their constitutional violations." *Howlett v. Rose,* 496 U.S. 356, 377-378 (1990).

24. "Municipalities and other bodies of local government are 'persons' within the meaning of this [42 USC §1983] statute. Such a body may therefore be sued meaning of this statute." *St. Louis v. Praprotnik,* 485 U.S. 112, 121 (1987)

25. "Federal law makes governmental defendants that are not arms of the State, such as municipalities, liable for their constitutional violations." *Howlett v. Rose,* 496 U.S. 356, 377-378 (1990)

26. However, "the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)

27. Here, there was action pursuant to official municipal policy where all the defendants worked under a common policy to exclude me from speaking, the rally attendees (the people that wanted to actually hear the rally speakers and were not protestors) from being in close proximity so that they might here, and the media from being anywhere near the Parkman Bandstand so that they could in any way meaningfully cover the speeches of the Boston Free Speech Rally-this amounted to a constitutional tort regarding policy set by

the Mayor, the Police Commissioner, the Commissioner of Parks and Recreation, as well as their immediate policy-making subordinates.

28. "A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).

29. The lawsuit against the City of Boston, *qua* a municipality and a "person" for 42 USC § 1983 purposes, is not in the nature of a respondeat superior theory and is not brought as such.

30. Rather, here, the official policy of the Mayor of Boston, the Police Commissioner, the Parks and Recreation Department Commissioner, and their immediate policy-making underlings caused the injury as is the basis of the lawsuit against the City of Boston as a municipality. [5]

31. It has been said, "Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." *Jeffes v. Barnes,* 208 F.3d 49, 57 (2nd Cir. 2000).

32. While this lawsuit is taken against all the Boston Police Officers who might make the Nuremberg argument that they were just following the orders of a superior justifying

---

[5] That said, 42 USC §1983 does not countenance a Nuremberg defense of "I was just following orders." The policy makers and those abiding by an obviously unconstitutional policy are all liable.

their own role in suppressing my right to free speech, right to be meaningfully heard, and right to assembly, without doubt, *this lawsuit extends to the policy makers themselves*— the Mayor of Boston, the Police Commissioner, and the Commissioner of the Parks and Recreation—and because the policies of the City of Boston as implemented by its highest officials are the subject of this lawsuit, the municipality is a "person" as contemplated by 42 USC § 1983.

33. This lawsuit is about the policies set forth in handling the Boston Free Speech Rally of August 19, 2017 (and future rallies in the suit for injunctive relief), not just the errant behavior of a constable or two.

34. "Generally, a municipality in a section 1983 case may not be held liable for the acts of its employees on a *respondeat superior* basis." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).

35. Accordingly, any lawsuit against the City of Boston itself (not the other defendants), is not predicated on any theory of *respondeat superior.*

36. "Rather, [liability against a municipality for violate of 42 USC §1983] may be held liable for such acts only to the extent that they are tantamount to a "custom" or "policy" of the municipality." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).

37. "This may be proved by a showing that (i) the acts were carried out pursuant to established policy or were reflective of a governmental custom, or (ii) were taken or ratified by a final policymaker for the municipality or someone to whom final policymaking authority clearly was delegated." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).

38. Here, the orders to not allow me to speak (or others similarly situated), to not allow rally attendees to come anywhere near the Parkman Bandstand so that they could hear the speakers, or to allow the media to enter or be near the Parkman Bandstand were policy decisions ratified by a final policymaker for the municipality or someone to whom final policymaking authority clearly was delegated,  namely the Mayor of Boston, the Boston Police Commissioner, and the Commissioner of Parks and Recreation, and their immediate policy making subordinates.

39. I was treated the same way by countless police officers *acting under policies issued from the highest ranks*—these were not a few, isolated police officers.

40. If preventing me from speaking and preventing me from being meaningfully heard by an audience and the media was a constitutional wrong, this was a constitutional wrong carried out by dozens if not hundreds of police officers, acting under policies set forth by the highest officials in the City of Boston.

41. "In *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom" that caused the plaintiff's injury." *Martin v. Inhabitants of Biddeford,* 2003 U.S. Dist. LEXIS 5375, *36-37.

42. Here the municipal *policies* created by the Mayor, the Police Commissioner, and the Commissioner of Parks and Recreation and not the product of isolated police officers were:

   a. Not allowing numerous speakers to enter the Parkman Bandstand if they did not arrive at some arbitrary time that was not known to the organizers of the Boston Free Speech Rally.

   b. Not allowing rally attendees (as opposed to the protestors) to be anywhere near the Parkman Bandstand so they could possibly be heard by the speakers.

c. Not allowing sufficiently amplified speech.

d. Not allowing media to enter the Parkman Bandstand or be anywhere near it so they could cover what the speakers said.

43. "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality," *Martin v. Inhabitants of Biddeford,* 2003 U.S. Dist. LEXIS 5375, *36-37, and in this particular case, it is very easy to find policies implemented by the Mayor of Boston, the Boston Police Commissioner, and the Boston Commissioner of Parks and Recreation.[6]

44. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decision maker may still fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

45. "A municipality may be sued directly for a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *D'Ambra v. City of Providence,* 2012 U.S. Dist. LEXIS 186345, *16 (quoting *City of St. Louis*)

46. That is exactly what I am doing—suing the City of Boston for a constitutional tort through its policies and decisions officially adopted and implemented.

47. [A municipality in a section 1983 case] "may be held liable for such acts only to the extent that they are tantamount to a 'custom' or 'policy' of the municipality. This may be proved by a showing that (i) <u>the acts were carried out pursuant to established policy</u> or were reflective of a governmental custom, <u>or</u> (ii) <u>were taken or ratified by a final</u>

---

[6] In fact, the argument that these individual police actions were not done under a policy implemented by the City of Boston's highest officials would be a frivolous defense.

policymaker for the municipality or someone to whom final policymaking authority clearly was delegated. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121, 123, 126-27, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988); *Archer v. Town of Houlton,* 2001 U.S. Dist. LEXIS 14163, *33 (Dist. Maine).

48. Here, the acts of the Boston Police Officers were carried out pursuant to an established policy on how to deal with the Boston Free Speech Rally promulgated by the Mayor, the Police Commissioner, and the Commissioner of Parks and Recreations, with the support of their immediate subordinate policy makers.

49. The "custom" or "policy" must in turn have been "the cause of and the moving force behind the deprivation of constitutional rights." *Hodsdon v. Town of Greenville,* 52 F. Supp. 2d 117, 124 (D. Me. 1999) (citation and internal quotation marks omitted) *Archer v. Town of Houlton,* 2001 U.S. Dist. LEXIS 14163, *33 (Dist. Maine).

50. This is precisely what happened:

    a. I was not allowed to enter the Boston Free Speech rally or get near the Parkman Bandstand *because of the policies Boston Mayor, the Boston Police Commissioner, and the policies of the Boston Commissioner of the Department of Parks and Recreation and their immediate policy creating underlings*;

    b. The rally attendees (i.e., those that wanted to hear and were not protestors) were not allowed anywhere the Parkman Bandstand so they could hear *because of the policies Boston Mayor, the Boston Police Commissioner, and the policies of the Boston Commissioner of the Department of Parks and Recreation and their immediate policy creating underlings*;

    c. My right to assembly was violated *because of the policies Boston Mayor, the Boston Police Commissioner, and the policies of the Boston Commissioner of the Department of Parks and Recreation and their immediate policy creating underlings*;

    d. My right to have my speech sufficiently amplified so that I might effectively speak, and my fellow speakers was violated *because of the policies Boston*

*Mayor, the Boston Police Commissioner, and the policies of the Boston Commissioner of the Department of Parks and Recreation and their immediate policy creating underlings;*

e. The media were not allowed anywhere the Parkman Bandstand so they could hear my speech and that of my fellow speakers *because of the policies Boston Mayor, the Boston Police Commissioner, and the policies of the Boston Commissioner of the Department of Parks and Recreation and their immediate policy creating underlings;*

f. In short, the policies established by the Mayor of Boston, the Police Commissioner, and the Commissioner of Parks and Recreation were in turn "the cause of and the moving force behind the deprivation of constitutional rights."

51. The Mayor and the defendant office heads (the Police Commissioner and the Commissioner of Parks and Recreation) set the policy for the Boston Free Speech Rally, and the Boston Police followed this policy.

52. "A policy may be either a policy statement, ordinance, regulation, or <u>decision officially adopted</u> and promulgated by the municipality's governing body." *St. Louis v. Praprotnik*, 485 U.S. 112, 121, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988).

53. The Mayor, the Police Commissioner, and the Commissioner of Parks and Recreation made decisions and officially adopted them to be implemented by the municipality, and as a direct result, I was injured and deprived of my constitutional rights.

54. "Municipal officials who have final policymaking authority may, by their actions, subject the government to Section 1983 liability." *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).

**COUNT 1, 42 USC §1983: Interference with my right to speak**

55. The previous paragraphs are incorporated by reference.

56. Pursuant to the First Amendment of the United States Constitution, "Congress shall make no law . . . underline abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

57. In *Gitlow v. New York*, 268 U.S. 652 (1925), the First Amendment of the United States Constitution was held to apply against the states via incorporation by the Due Process Clause of the 14th Amendment, holding "freedom of speech and of the press which are protected by the First Amendment from abridgment by Congress are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."

58. Pursuant to 42 USC § 1983, "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress . . ."

59. I bring this 43 USC §1983 action against all defendants for violating my rights to free speech, the corollary right of free speech of being presented a meaningful opportunity to

be heard,[7] violation of freedom of the press and the corollary right of being covered by the press,[8] and the right of assembly.

60. All of the named defendants were acting under color of law.

61. Because of my progressive credentials and my history of fighting for the First Amendment in court rooms, I was invited to be a speaker at the Boston Free Speech Rally that took place on Saturday, August 19, 2017 at the Parkman Bandstand, which is in the Boston Commons in Boston, Massachusetts.

62. The Boston Free Speech Rally of August 19, 2017 was organized by the Boston Free Speech Society

63. The Boston Free Speech Rally on August 19, 2017, ironically became one of the greatest specimens of the repression of free speech by a municipality:

   a. Numerous speakers (including myself) were not allowed to speak.

   b. People that were not protesting the Boston Free Speech Rally and wanted to hear the speakers were not allowed anywhere near the speakers so that they could be heard.

   c. Apart from bullhorns, the Boston Free Speech rally was not allowed to have any amplification equipment and they were drowned out by the attending crowd.

   d. The media was not anywhere near the Parkman Bandstand and could not hear the speakers though numerous media outlets wanted to.

64. The Boston Free Speech Rally was such a disaster for free speech that Scott Adams (the creator of the Dilbert cartoon) to say,

---

[7] There is no right to have people like your message or want to hear it; but there is a right to be heard and be free from governmental interference if there are those that want to hear you.
[8] Freedom of the press would include my right to be covered by the press and have interviews with reporters that wanted to interview me, and the right to have my speech heard by reporters.

"That was the world's most successful free speech rally, because I assume what they are trying to say is that there is no free speech and they would like some. And in the process of saying there is no free speech and they would like more of it, gigantic crowds of the anti-First Amendment group Antifa appeared, stormed in to shut them down thus proving their point."[9]

65. It was not just Antifa that suppressed speech—it was the policies and practices of the City of Boston and the Boston Police Department.

66. I was invited by John Medlar of the Boston Free Speech Society to speak at the Boston Free Speech Rally and was asked to show up around noon.

67. Although I had Lyme disease and was fatigued, I was able to be punctual and showed up around noon.

68. The morning of August 19, 2017, I appeared in articles in both the Boston Globe and the Berkshire Eagle; the story in the Boston Globe on the morning of Saturday, August 19, 2017 was titled, "Boston Free Speech organizers planned to start with moment of silence for Charlottesville victim," and it read "The speakers who were scheduled to start shortly after noon were: Dan Hill, Michael Lindskog, Garret Kirkland, Daniel Alejandro Medina, Benjamin/Citizen D'Amour, Donnie Palmer, <u>Rinaldo Del Gallo</u>, and Tammy Lee."

69. I also appeared in the Berkshire Eagle on Friday, August 18, 2017, which in an article entitled, "Pittsfield Activist to Protest Neo-Nazi Movement[10]," which read:

> Rinaldo Del Gallo, however, may head to Boston. The Pittsfield-based attorney and former state Senate candidate said he was invited by free speech rally organizer John Medlar, to speak as a "progressive."

---

[9]
https://www.facebook.com/ResistMarxism/videos/1657823327602636/?hc_ref=ARReJv
jzXxx8iS_xOXhNL0-RdZELIGQSU_o-Hlo1yJykHIUD4aBUzOsob0-dMogx-nM&pnref=story,
retrieved on Tuesday, October 31, 2017.
[10] There were no white supremacist or Nazis that spoke, and there appeared to
be nobody of such a description that was openly of such a description at the
event.

Del Gallo said while he's "the total polar opposite" of a far-right white supremacist, he is a strong free speech advocate, and worries about leftist movements like the antifa, that he says are trying to suppress free speech.

He said killing right-wing free speech can just as easily kill it on the left.

"What comes around goes around," he added.

And while a bad case of Lyme's Disease might keep him from the podium, he said, he's also nervous about wading into what he said could be some fascist muck that might soil his progressive track record of support for things like transgender rights and sanctuary city status for Pittsfield.

"I'm on the fence," he said. "I don't agree with [the alternative right], but I agree with the ACLU."

70. The point of mentioning these articles that specifically mention me is that

   a. The articles were published the morning of the Boston Free Speech Rally or the day before.

   b. I had identification to prove that I was Rinaldo Del Gallo and that I was completely willing to present to the Boston Police Department.

   c. I had repeatedly asked Boston Police Officers to go on the Internet and search that I was indeed in the Boston Globe and listed as a speaker.

   d. I had also called 911 dispatch and explained that I was trying to get in and speak, and made it very clear that I could prove I was a speaker because I was listed in the Boston Globe as a speaker and had identification to prove that I was actually Rinaldo Del Gallo.[11]

71. Importantly, at all times the Boston Free Speech Rally at no time appointed the Boston Police Department to determine would be provided admittance to speak or admittance to attend the rally: that was a role the Boston Police Department took upon themselves,

[11] I hereby provide notice that these 911 telephone calls should be preserved.

without any go ahead from the organizers of the Boston Free Speech Rally or even advance notice.

72. When I arrived, the Parkman Bandstand was cordoned off by an array of fences that left several football fields distance between the speakers and everyone else. (Some media reports mention 30-40 yards, but I remember a larger distance at points.)

73. If one looks at photos of the Parkman Bandstand, the Parkman Bandstand has a hub and spoke design, with the circular Parkman Bandstand in the center and serving as the "hub," with various sidewalks leading out from it and serving as its spokes.

74. There were fenced "walk ways" that went over the sidewalks, and at each end were a bunch of Boston Police Officers.

75. By the time I arrived, the Boston Police had allowed Antifa to block all the entrances to the Parkman Bandstand to frustrate the ability of speakers to speak.

76. As I got off the subway, I asked a number of Boston Police Officers where I could enter and speak—none would bring me to the Parkman Bandstand.

77. On the Day of the Boston Free Speech Rally, there was fencing around the Parkman Bandstand, and the fencing formed a sort of hub of the wheel with spokes, the "spokes" being fenced off paths to the Parkman Bandstand that appeared to fall along the 6 sidewalks leading to the Parkman Bandstand.

78. At the end of the paths Boston Police guarded the sidewalks to the Parkman Bandstand with a bunch of police officers.

79. They did not allow the gates to remain open, but fenced them off, and in turn members of Antifa blocked off the gates.

80. After I arrived, I kept asking Police Officers to let me in at each gate, they would refuse and then send me to another gate, which took a very long time to get there because of the thick and large crowds.

81. By the time I reached the second set of police officers at one of the gates, sensing that they were playing around with me, I yelled to them that I demanded to be let in to speak, that I was an invited speaker, and that if they did not let me in, I would sue them—I was repeatedly subject to a pattern of being sent to another gate.

82. Nobody from the Boston Free Speech Rally appointed the Boston Police to be gatekeepers—nonetheless they repeatedly refused my demands to be allowed to go to the Parkman Bandstand.

83. I have three videos of my efforts to get police to let me in.

   a. On one tape with four officers present I can be clearly heard, "Officer, listen to me. I am a speaker. I am going to sue you if you don't let me in. Will you let me in? I am a speaker. We have a permit. I keep asking you if you will let me in." The unknown Boston Police Officers did not let me in—I want their names to be brought about in discovery and I want to name them as defendants. One did say he was badge "258." I can be heard saying, "I am going to ask you again sir, will you please let me in?" The Police Officer replies, "I already told you sir I am not going to let you through." I replied, "You keep asking me to go to other gates—I have been to every other gate.

   b. In another video, I go up to two other police officers, "Hi officer, my name is Rinaldo Del Gallo. I have repeatedly asked various police officers . . . your badge number is 16, . . . what's your badge number. . . [the Boston Police Officer stood there with his arms wrapped in front of him, refusing to provide his badge number.] The Police Officer replied, "How can I help you sir," instead of providing me with his badge number. I replied, "Well, I am trying to get in there and I am one of the speakers and I keep asking to get in. My name is Rinaldo Del Gallo. I am one of 6 speakers. They keep sending me to different gates. I keep going from gate to gate to gate and nobody is letting me in, and I am about to sue the Police because the only way I can get in is jump the gate, and if I jump the gate, I am sure I would be arrested." I then asked him "if I jumped the gate I

would be arrested, would I not?" The officer replied "I don't know what to tell you" and did not let me in. I again repeated, "Sir I am asking you to let me in" and he replied "that's not my job." I then asked the police officer standing next to him if he would let me in, and he again sent me to another location, to which I replied again that I kept being sent from location to location. I wish to indentify these officers through discovery and have them as named defendants.

c. Most of my encounters of the police I do not have on film—I asked countless officers to let me in, at every gate. I certainly want to have all the police officers at all the gates named through discovery and have them sued as proper defendants as they were clearly at fault—they heard me ask to be let in and they repetitiously refused.

d. Finally, in a third video, at another gate, a police officer identified himself as a "Police Officer Greeland" or something to that effect—I expect to get the name in discovery and name him as a proper defendant. I asked him "if there was any way to ask them" if I could speak. I was told that "they were gone"—the speakers were in fact still at the Parkman Bandstand and would have allowed me to speak.[12] The Police Officer than said his badge number was "number 10" and I said I appreciated him telling me." I then said "I respectfully disagree" and that "this might turn into a lawsuit." He still did not let me in. I said, "Here's the problem. I am one of the speakers and if I try to speak, I'll get arrested." Officer Greenland said "no" when I asked to be allowed in. He then added, "If someone here said you were one of the speakers, then we would let you in." Of course, had they allowed me to enter John Medlar or others would have identified me as a speaker. Officer Greenland said, "There is no one here from the group saying you have permission to speak." I replied, "Well you can find out if I can speak." Obviously, the solution was to walk to the Parkman Bandstand and ask if I was a speaker. Nobody appointed the Boston Police Department to be gatekeepers at the event. Officer Greenland said, "I have no idea who you are." I replied that I was "actually in the Boston Globe" and that there it said I was a speaker. I had identification to show him, and you can get the Internet on your phone or call headquarters. Officer Greenland said, "That's fine, you assume that I read and that I know who you are." Actually, I was assuming that he could read it on his phone, or call headquarters to find out. He was actually keeping out a speaker and preventing them from speaking. He said "I don't know who you are." I replied, "Well, you can find out." He replied, "I don't want to find out." I

[12] I know because I ultimately left with the speakers in police vans because we were being attacked by Antifa.

replied, "So your theory is that I can't get in because you don't really know if I can really speak, and I am representing to you that I can."

e. At one point I called police headquarters[13] and identified myself as a speaker. I asked them to go one line and Google "Boston Globe" and "Rinaldo Del Gallo." They did not and refused to let me in or make any effort to speak to a supervisor on the ground.

f. Obviously, they were doing everything possible to not let me speak—I arrived punctually (not that it should it have mattered if I was late), I wanted to go to the Parkman Bandstand to speak I was repetitiously told that I could not be one police officer after another—countless others just ignored me though they plainly heard my request to be let in.

g. Most of the Boston Police Officers refused to identify themselves.

84. While our First Amendment law has noted that parks from time immemorial have been quintessential "traditional public forums," the Parkman Bandstand has been especially a well-used traditional public forum:

a. In 2007 both Presidential Obama and gubernatorial candidate Deval Patrick gave speeches from the Parkman Bandstand in support of Deval Patrick's candidacy.

b. In 1992 NORMAL had a one of its "Boston Freedom Rallies" there in support of legalizing marijuana.

c. One website notes: "The Parkman Bandstand was named for one of the Common's greatest benefactors, George Francis Parkman Jr., who died in 1908 and left $5 million for the care of the Common and other city parks. The bandstand was originally dedicated in 1912 and was restored in 1996. It still hosts small events such as midday concerts, theatrical productions, weddings and speeches (Obama in 2007). Annually, the Boston Freedom Rally is held at Parkman Bandstand, the second largest rally calling for the reform of marijuana laws in the United States. The Commonwealth Shakespeare Company puts on free

---

[13] Please consider this a formal demand that evidence of the phone call be preserved.

plays from Parkman Bandstand, drawing as many as 100,000 theater-lovers into the park every summer."[14]

d. The Parkman Bandstand is a quintessential, traditional public forum under our First Amendment jurisprudence that has been available to countless speakers.

85. The defendant police officers, under policies determined by the Mayor of Boston, the Boston Police Commissioner, and the Commissioner of Parks and Recreation and without the consent of consultation of the Boston Free Speech Rally, erected fence barricades that were so far from the Parkman Bandstand, that even with bullhorns it was utterly impossible for anybody to hear what the speakers were saying—this combined with the fact that the Boston Free Speech Rally was not allowed to have an amplification system was an intentional act by the defendants that was intended and had the natural effect of assuring the speakers were not heard.

86. Combing the lack of amplification with keeping rally attendees [i.e., the ones that wanted to hear the speech] far away, not allowing press into the Parkman Bandstand, and preventing several speakers such as myself from speaking made this farce of free speech a dangerous precedent; in the future Boston and municipalities will follow Boston's example and isolate unfavorable speakers, not allow them to have their audience nearby through the use of distance and severe restrictions on their amplification, will cut short the event by not allowing scheduled speakers to enter and speak, and not allow the press meaningful access to the speakers to cover the event, but issue a permit and pretend that the First Amendment has been complied with by this farce.

---

[14] https://parkmangenealogy.wordpress.com/2010/01/02/parkman-bandstand-boston-common/ retrieved on Tuesday, October 31, 2017.

87. This is a very rare case of such extremely inappropriate police conduct—I was a speaker at an organized and permitted event, I was invited to speak, and the defendants colluded [15]under the policies set forth by the Mayor, the Police Commissioner, and the Commissioner of Parks and Recreation to defeat my rights to speak, to be heard, to assemble, and to be covered by the press as I spoke.

## COUNT 2, 42 USC §1983: INTERFERENCE WITH MY RIGHT TO BE HEARD BY NOT ALLOWING THE RALLY ATTENDEES[16] TO BE ANYWHERE NEARS THE PARKMAN BANDSTAND

88. The previous paragraphs are incorporated by reference.

89. The right to speak includes a right to be heard.

90. A defendant cannot undo an injury by claiming it is moot because of other injuries that they inflicted.

91. While it is true that I was not allowed to enter the Parkman Bandstand, I was still injured and I have standing to sue for the defendants removing the audience from anywhere near enough of a range to be heard, and for denying amplification of sound beyond some feckless bullhorns.

92. "By now, there is a "clearly established right to assemble, to protest, **and to be heard while doing so**." *Amnesty Int'l v. Battle,* 559 F.3d 1170, 1185 (11th Cir. 2009)

---

[15] "Colluded" is not an overstatement.  It is what they did.  They acted in concert to deny me my rights to speak, to be heard by our audience, and to be covered by the media.  I was an orchestrated effort with a purpose undertaken by all the defendants.  That is what collusion is.
[16]  I.e., the people who wanted to hear the speakers and were not protestors.

93. "It is now well-established that "police may not create a police cordon that makes a protest rally totally ineffective," *Amnesty Int'l v. Battle,* 559 F.3d 1170, 1185 (11th Cir. 2009), yet this is exactly what the defendants did—the isolated the speakers.

94. "**The right to speak freely is meaningless without the corresponding right of a listener to hear what is spoken**. The listener's right to receive information is also protected by the First Amendment." *Adust Video v. Nueces County,* 996 S.W.2d 245, 251 n. 4 (Sup. Ct. of Texas 1999); *See Kleindienst v. Mandel*, 408 U.S. 753, 762, 33 L. Ed. 2d 683, 92 S. Ct. 2576 (1972); *Red Lion Broad. v. F.C.C.*, 395 U.S. 367, 390, 23 L. Ed. 2d 371, 89 S. Ct. 1794 (1969); *Thomas v. Collins*, 323 U.S. 516, 534, 89 L. Ed. 430, 65 S. Ct. 315 (1945).

95. "It is now well established that the Constitution protects the right to receive information and ideas. 'This freedom [of speech and press] . . . necessarily protects the right to receive . . . .'" *Kleindienst v. Mandel,* 408 U.S. 753, 762-763 (1972)

96. "**[T]he First Amendment carrie[s] with it a 'right to be heard' that should not be infringed.**" *Amnesty Int'l v. Battle*, 559 F.3d 1170, 1182 (11th Cir. 2009); *Saia v. New York*, 334 U.S. 558 (1948)(striking down a vague ordinance which outlawed amplification from a motor vehicle so the speaker could be bear.

97. "**There is a First Amendment right to be heard by the audience of [one's] choosing.**" *Natural Resources Defense Council v. Pena*, 147 F.3d 1012, 1019 (Fed. D.C. Court of Appeals 1998).

98. By distancing the rally attendees so they could the speakers could not be heard and not allowing them to effectively attend the rally and hear, my right to be heard was violated.

### COUNT 3, 42 USC §1983:  INTERFERENCE WITH MY RIGHT TO BE HEARD BY NOT ALLOWING SUFFICIENT AMPLIFICATION OF POLITICAL SPEECH

99. The previous paragraphs are incorporated by reference.

100.        The problem of having the rally attendees so far from the speakers was aggravated by not allowing amplified sound other than hand-held bullhorns that were far too ineffective.

101.        By not allowing amplification so that I could be heard over protestors, my right to be heard protected under the First Amendment was infringed.

102.        There is a right to amplify sound so one may be heard engaging in political speech.

103.        Numerous "acceptable" speakers are allowed amplification, and the denial of the right to amplify the sound was not only a content based restriction, it was viewpoint based.

104.        Because the Mayor had expressly stated "we don't want you hear," every effort was made to make ineffective the speakers speech, including my own, by keeping away any audience at such physical lengths that they could not be heard, and then prohibiting amplification.

105.        In *Saia v. New York,* 334 U.S. 558 (1948), the United State Supreme Court held that a city ordinance forbidding the use of sound amplification devices in public places except with the permission of the Chief of Police was unconstitutional.

106.        In *Saia v. New York,* 334 U.S. 558 (1948), it was said, "**Loudspeakers are today indispensable instruments of effective public speech.**"

107.        In *Amnesty Int'l v. Battle,* 559 F.3d 1170, 1182-1183 (11th Cir. 2009) it

was said:

a. "In *Saia v. People of State of N.Y.,* the Supreme Court struck down an ordinance
which gave the police unbridled discretion to ban the use of loud speakers. 334
U.S. 558, 68 S. Ct. 1148, 92 L. Ed. 1574 (1948). The Court held that the First
Amendment carried with it a "**right to be heard**" that should not be infringed
upon by an ordinance in which "no standards [were] prescribed for the exercise of
[police] discretion." *Id.* at 560. This court noted that a constitutional problem
would arise were the government to deprive protestors of an audience by
drowning-out those protestors with the government's own, louder communication.
*Warner Cable Commc'ns, Inc. v. City of Niceville*, 911 F.2d 634, 638 (11th Cir.
1990) ("We agree that the government may not speak so loudly as to make it
impossible for other speakers to be heard by their audience. The government
would then be preventing the speakers' access to that audience, and first
amendment concerns would arise."). In *Ward v. Rock Against Racism*, the
Supreme Court reviewed a city's efforts to regulate the volume of amplified music
at concerts held at an amphitheater in a public park. 491 U.S. at 784. Although the
Court upheld the  city's limitations on volume, it did so only after noting that the
limits left open "ample alternative channels of communication" and that concert
organizers could still express themselves with their own decisions as to sound-
mixing and sound volume within the limits imposed by the city. *Id.* at 800-02.
These cases establish a "**right to be heard**" inherent in the First Amendment.
This right is obvious from the grant of the freedom of speech itself; **the right to
demonstrate would be meaningless if governments were entitled to isolate a
demonstration so completely that no one could see or hear it.**"

108.        Cases such as *Saia v. New York,* 334 U.S. 558 (1948) and *Amnesty Int'l v.*

*Battle,* 559 F.3d 1170, 1182-1183 (11th Cir. 2009) make it clear that the government

cannot make it impossible to be heard by excessive restrictions on amplification.

109.        By denying me and my other speakers at the Boston Free Speech rally

loudspeakers other than ineffective hand-bullhorns, I was rendered into having

ineffective speech.

**COUNT 4, 42 USC §1983:  Viewpoint Discrimination**

110.        The previous paragraphs are incorporated by reference.

111.        The Mayor of Boston publically stated, "We don't need this type of hate," "So my message is clear to this group. We don't want you in Boston. We don't want you on Boston Common."

112.        The Mayor's policies reflected that of a person that had strong animus to speakers and he was determined to make sure that the speakers did not have the meaningful opportunity to speak and be heard.

113.        The restrictions on me and the speakers and organizers of the Boston Free Speech Rally were not only content based, but viewpoint based—discovery and trial will show that numerous previous speakers, such as President Obama and gubernatorial candidate Deval Patrick were allowed to use amplifiers, and not just hand-held bullhorns.

114.        President Obama and gubernatorial candidate Deval Patrick and other groups did not have the Boston Police Department determine who was and who was not permitted to speak.

115.        President Obama and gubernatorial candidate Deval Patrick and other groups did not have speakers that were cut off by the Boston Police Department, but such was the case due to the animus towards the speaker's viewpoints of the Boston Free Speech Rally.

116.        President Obama and gubernatorial candidate Deval Patrick and other groups were not isolated from their audience, but such was the case due to the animus towards the speaker's viewpoints of the Boston Free Speech Rally.

117.        President Obama and gubernatorial candidate Deval Patrick and other groups were not restricted to outrageously inadequate sound systems, but such was the case due to the animus towards the speaker's viewpoints of the Boston Free Speech Rally.

118.        President Obama and gubernatorial candidate Deval Patrick and other groups were not isolated from the press, but such was the case due to the animus towards the speaker's viewpoints of the Boston Free Speech Rally.

119.        While restrictions based upon content face strict scrutiny, viewpoint discrimination (as opposed to a content-based discrimination) is per se illegal, unconstitutional, and has been since time immemorial, and the conduct of the defendants in their viewpoint discrimination and double standards showed as compared to previous speakers that had speech that was favored or acceptable was egregious.

120.        As a general matter, freedom of speech "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Showtime Entm't LLC v. Ammendolia,* 885 F. Supp. 2d 507, 518 (Dist. Mass. 2012)

121.        Cutting off speakers to shorten a rally, as the police did here, violates the right to assemble. *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 630 ("the police deprived them of their right to assemble peacefully when their protest march was cut short.)

**COUNT 5, 42 USC §1983:  INTERFERENCE WITH MY RIGHT TO BE HEARD AND FREEDOM OF THE PRESS (which includes the speaker's rights to be covered by the press)  BY NOT ALLOWING THE PRESS TO COVER THE BOSTON FREE SPEECH REALLY BY BEING ANYWHERE NEAR THE PARKMAN BANDSTAND**

122.        The previous paragraphs are incorporated by reference.

123.        In addition to not allowing to me approach the Parkman Bandstand even though I was an invited speaker; in addition to not allowing rally attendees anywhere near the Parkman Bandstand so that they could hear; in addition to not allowing for sufficient amplification; as if this was not enough, they would not allow media into the Parkman Bandstand to cover the event.

124.        Freedom of the press, which is explicitly provided for in the First Amendment, protects not only the rights of the press to interview and cover speakers, but the rights of speakers to be interviewed by the press who chose to interview them.

125.        Just as the First Amendment's right to speak has with a corollary right to be heard, the First Amendment's protections of the press has a corollary protection of the right to be covered by the press.

126.        Moreover, the right of speakers to meet with the press for interviews is a form of assembly and protected under the freedom of assembly clause of the First Amendment.

127.        The media had no idea what the speakers were saying because of the conduct of the defendants, and wanted to cover the event but were completely frustrated in this process—this not only violated their rights, but the rights of the speakers, including myself.

128.    In an August 25, 2017 article, the US Press Freedom Tracker website had an article entitled, "Boston law enforcement prevented journalists from covering controversial rally," said, "The New England First Amendment Coalition believes certain restrictions in place during the recent Boston Common protest unreasonably interfered with the right of journalists to cover a story of immense public interest. . . .Specifically, journalists should not have been banned from the Parkman Bandstand, where a controversial rally occurred on Aug. 19 and accommodations should have been made for close-up press coverage of the speakers as is usually done at public events. In addition, comments made by city officials indicate an intent to use an unusually large buffer zone to prevent supporters of the rally from expressing offensive views." [17] These statements are true and are hereby incorporated by reference.

129.    I have spoken to more than one journalist that said they did not know what was happening at the Parkman Bandstand.

130.    In fact, I had one journalist actually ask me what was said.

131.    US Press Freedom Tracker reported that "Boston Police Department Commissioner William Evans later said this separation was intended in part to make it more difficult for additional speakers to join the rally. 'That's a good thing because their message isn't what we want to hear,' The Boston Globe quoted Evans as saying.

132.    The Boston Globe, on August 19, 2017, in an article reported by Beth Healy, reported,

---

[17] https://pressfreedomtracker.us/blog/boston-law-enforcement-prevented-journalists-covering-controversial-rally/ retrieved Saturday, November 04, 2017.

"The separation from the crowds and the news media was by design. The rally had a buffer of about '35, 40 yards' according to Boston Police Commissioner William Evans, <u>in part for safety, but also to dampen their voices.</u>[18] If some speakers were unable to make it to the bandstand, Evans said, "<u>That's a good thing because their message isn't what we want to hear.</u>" [19] [20]

133.        I plan to call Beth Healy as a witness because she witnessed the Police Commissioner's statements and admissions, as well as the WBUR reporter that recorded the comments.

134.        In a statement issued the day before the event, the department announced restrictions for the media: "There will be NO designated media staging area inside the Common," it said. "Media Members are expected to remain mobile and refrain from long term stationary reporting which may incite and attract participants. NO media personnel will be allowed inside the barricaded area around the Bandstand."

135.        The treatment of the media was so awful that a letter was hand-delivered to the Mayor of Boston which read,

a.  "We—the New England First Amendment Coalition (NEFAC), the Massachusetts Newspaper Publishers Association (MNPA), the New England Chapter of the Society of Professional Journalists (SPJ-NE), the American Civil Liberties Union (ACLU), and the ACLU of Massachusetts (ACLUM), on its own behalf and on behalf of individual Boston-based journalists—write to express our concern that journalists were improperly excluded from the buffer zone around the Boston Common's Parkman Bandstand during the rally on August 19, 2017, and to seek assurances that this exclusion will not be repeated at the rally that has reportedly been scheduled for November 18."[21]

---

[18] The buffer zone appears much larger than 35 to 40 yards, save for maybe the back part which had a large wall that blocked everybody off anyhow.
[19] See also http://news.wgbh.org/2017/09/05/boston-public-radio-podcast/police-commissioner-evans-no-deliberate-attempt-block-media

[20] This was actually recorded and is on a WBUR podcast, http://www.wbur.org/news/2017/08/20/gellerman-free-speech-rally

[21] https://aclum.org/wp-content/uploads/2017/10/CityofBostonNovember18Rally-October24.pdf

136.        In an August 25, 2017 article published by the Columbia Journalism

Review entitled, "Boston authorities should not have blocked media from covering

protest" had a number of errors,[22] but which quoted an editor of the Boston Globe:

> In a statement to CJR, *Boston Globe* Editor in Chief Brian McGrory added:
>
> *"[W]e're frustrated over our inability to gain access to the free speech rally, such as it was. **On paper, the buffer zone did not appear onerous, but it was in reality when you factor in the lack of any sound system.***
>
> *What we lost was our ability to put the massive counter-protest into its fullest possible context by accurately reporting — but in no way amplifying — the possibly hateful thoughts[23] that were being spoken or spewed by the free speech group.*
>
> *Knowing what we do now, we would strongly advocate for future remedies, including close-up pool coverage of all aspects of the event. We will reach out to law enforcement to achieve this, with the belief that better access would in no way hamper police from the strong work they did in keeping people safe."*

137.        *Boston Globe* Editor in Chief Brian McGrory will be called as a witness to

the restrictions the Boston Globe faced.

138.        The First Amendment protects the Freedom of the Press, which certainly

includes the right of the press to function and operate.

139.        But just as the right to speech has a corollary right to be meaningfully

heard (especially by a willing listener and/or a non-captive audience), the right to

freedom of the press includes corollary right to speak and be heard by the press and

otherwise covered by them (should the press be willing to do so).

---

[22] None of the speakers were white nationalist, and certainly none were neo-Nazis.
[23] There were no hateful thoughts—of course the Boston Globe could not immediately know, since they were not allowed to cover the event.

140.         A person who could not be covered by a willing a press that wanted to cover them has been as wronged by the government as the press itself.

141.         Also, by preventing the media from meeting with the speakers, the right of assembly was violated.

## COUNT 5, 42 USC §1983: INTERFERENCE WITH THE RIGHT TO ASSEMBLE AND FREEDOM OF ASSOCIATION

142.         The previous paragraphs are incorporated by reference.

143.         There is a constitutional "right to assemble, speak, and demonstrate." *Anderson v. City of Columbus*, 2015 U.S. Dist. LEXIS 120588, *1 (S.D. of Ohio 2015). See also *Thomas v. Collins,* 323 U.S. 516, 534 (1945)(holding that "there was restriction upon Thomas' right to speak and the <u>rights of the workers to hear what he had to say,</u> there can be no doubt.)

144.         "The right of persons to protest any phase of federal taxation and the methods used to enforce it, as well <u>as their right to assemble peaceably with others to make their protest more effective</u>, is guaranteed under the First Amendment to the Constitution of the United States." *Ex parte Tammen*, 438 F. Supp. 349, 356 (N.D. Tex. 1977).

145.         "[T]the right to assemble cannot be exercised alone, but it is still an individual right." *District of Columbia v. Heller,* 554 U.S. 570, 579 (2008).

146.         "It has been explicitly and repeatedly affirmed by this Court, without a dissenting voice, that freedom of speech and of assembly for any lawful purpose are rights of personal liberty secured to all persons, without regard to citizenship, by the due

1

process clause of the Fourteenth Amendment." *Hague v. Committee for Indus. Org.,* 307

2

U.S. 496, 519 (1939).

3

4

147.          There is a "right to assemble" and an "opportunity to be heard" and "to

5

assemble." *Florida State Conf. of NAACP Branches v. City of Daytona Beach,* 54 F.

6

Supp. 2d 1283, 1288 (1999).

7

148.          "Political demonstrations and protests fall squarely within the ambit of

8

9

such protection. *Boos v. Barry*, 485 U.S. 312, 318, 108 S. Ct. 1157, 99 L. Ed. 2d 333

10

(1988). Indeed, the First Amendment protection of freedom of speech reaches its zenith

11

under circumstances germane to demonstrations and protests: that is, when speech is

12

provocative and challenging, when it "induces a condition of unrest, creates

13

dissatisfaction with conditions as they are, or even stirs people to anger." *Edwards v.*

14

*South Carolina*, 372 U.S. 229, 237, 83 S. Ct. 680, 9 L. Ed. 2d 697 (1963). Well-settled

15

16

 law therefore enjoins the police from "interfer[ing] with orderly, nonviolent protests

17

merely because they disagree with the content of speech or because they simply fear

18

possible disorder." *Papineau v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (Sotomayor, J.)

19

(citing applicable Supreme Court case law); *see also Amnesty Intern., USA v. Battle*, 559

20

21

F.3d 1170, 1183 (11th Cir. 2009) (discussing U.S. Supreme Court jurisprudence and

22

holding that plaintiffs/demonstrators enjoyed a First Amendment right to be heard

23

without unreasonable police interference)." *Peña-Peña v. Figueroa-Sancha,* 866 F. Supp.

24

2d 81, 88 (Dist. Puerto Rico 2012)

25

149.          By not allowing me to join the others in the Boston Free Speech Rally, my

26

First Amendment rights of assembly and association were violated.

27

28

1   150.        By now allowing the rally attendees to be near enough to hear and

2   participate in the rally, my First Amendment rights of assembly and association were

3   violated.

4

5   151.        By now allowing the press to join me at the Parkman Bandstand, my First

6   Amendment rights of assembly and association were violated.

7

8   ## SEEKING INJUCTIVE RELIEF, AND SEEKIGN PRELIMINARY INJUCTION

9   152.        The previous paragraphs are incorporated by reference.

10

11  153.        The defendants have really played around with the organizers of the

12  November 18, 2017 event, rally entitled, "Resist Marxism, Rally for the Republic."

13  154.        The "Resist Marxism, Rally for the Republic" event schedule for

14  November 18, 2017 is being sponsored by "Boston Free Speech," an unincorporated

15  association that sponsored the Boston Free Speech Rally of August 19, 2017, and another

16  unincorporated associated entitled "Resist Marxism."[24]

17

18

19

20

21

22  [24] While I support the Nordic socialistic states such as Denmark, Norway,
    Iceland and Sweden (the so called "Nordic Model"), I am not a Marxist and
23  believe that communism was and remains a catastrophic system of government. I
    believe in a healthy admixture of government and capitalism and government
24  services, and favor such things as universal healthcare and government
    funded, free higher education.  I also recognize that when there is excessive
25  intervention in the private sector, you can have a Venezuela which is
    undergoing tremendous economic turmoil and despair. So while I am progressive
26  and some might characterize me as a "socialist," I am definitely opposed to
    Marxism. Most of the people of Antifa that cause most of the uprest
27  completely reject capitalism (which I certainly have not)and tend to be
    anarchistic and/or completely repudiate capitalism in any form.  Socialism be
28  proper definition is a system where by the government provides some goods and
    services and capitalism provides the rest the remainder of the goods and
    services.

155.         The stated purpose of the "Resist Marxism" event is to "defend freedom of speech from local government suppression and the violent mobs."[25]

156.         Resist Marxism, through the actions of a Mr. Mark Sahady had tried to secure a permit for Saturday, November 18, 2017 for the Parkman Bandstand.

157.         The City of Boston allows the public to secure use of the Parkman Bandstand through its website.

158.         If one goes to the website of the Boston Department of Parks and Recreation (https://www.boston.gov/departments/parks-and-recreation), there is an icon at the bottom that reads "Get a permit to hold an event or a wedding at a park.)

159.         There is then a link that says "view facilities for permit request," which says:

> To request a permit for a facility you will need to obtain a Login
> Name and Password and then click the Reserve button. You will be asked
> to select an event type, submit a description and input a maximum number
> of guests. Search for your facility by Facility Type and select the facility
> you wish to reserve.

160.         Mark Sahady of Resist Marxism sought the Parkman Bandstand and saw the Saturday, March 18, 2017 was free.

161.         Though the Boston Parks and Recreation Department says on their website, "An email within 10 business days will be sent for approval or denial of your request,"[26] the Department of Parks and Recreation took 28 days to respond.

---

[25] It has been observed that Antifa themselves have engaged in, ironically of all things, Fascistic behavior in suppressing the freedom of speech of others.

162.     People representing Resist Marxism met with the Department of Parks and Recreation on several occasions (at least three times) and one meeting with the Boston Police Department and members of the Resist Marxism group were led to believe that the permit would issue for Saturday, November 18, 2017—at each and every meeting only Saturday, November 18, 2017 was discussed.

163.     Members of Resist Marxism met with Boston Parks and Recreation Department Commissioner Christopher Cook and many others.

164.     The meetings were just an effort to derail the Saturday, November 18, 207 meeting—neither the Parks Department nor the Police Commissioner was serious about the Saturday, November 18th date.

165.     The Department of Parks and Recreation claimed it conflicted with a road race (the Camp Harborview Citython), and even though the Resist Marxism group was willing to have the event later on Saturday, November 18th so there would be no conflict, that request was refused.

166.     Sunday, November 18, 2017 will not work—speakers have bought air tickets, reserved hotels, day off from work have been taken, and press releases have gone out to the public.

167.     Moreover, Resist Marxism was willing to have their even later in the day to not conflict with the road race—the City of Boston rejected this position.

168.     One of these meetings was with Commissioner of Parks and Recreation Christopher Cook, and one was with Police Chief William Evans.

---

26
https://anprod.active.com/cobparksandrecdepart/servlet/downloadFile.sdi?uploa
dedfile_id=C9880E8B07

169.     At these meetings, city officials had mentioned it to moving the Rally to Sunday, November 19, 2017, but this was quickly rejected by the members of Resist Marxism and this was never really something they considered and it was not talked about other than this once.

170.     An e-mail with a rejection letter came on Thursday, October 26, 2017 from an application on September 18, 2017.

171.     The organizers of the event are being played yet again—there is seemingly some trick always up the sleeve of Boston officials.

172.     The last time it was to give a permit, but outlaw an audience, amplification, media access, and cut the meeting short by denying speakers.

173.     This time it is excessive delay and switching the dates on the organizers to make the event impossible that is frustrating the First Amendment.

174.     These unexcused delays have their First Amendment injuries, and there is case law to this effect.

175.     **"Unexcused delay in the administrative act of denying an individual park permit" constitutes a 1st Amendment violation."** *Contemporary Music Group, Inc. v. Chicago Park Dist.,* 57 Ill. App. 3d 182, 186 (1978).

176.     The case of *Slate v. McFetridge,* 484 F.2d 1169 (7th Cir.1973), is illustrative: in that case "Martin Slate and his fellow plaintiffs brought this action pursuant to 42 U.S.C. § 1983, seeking damages under the First Amendment for the refusal of defendants William F. McFetridge, Daniel J. Shannon and Thomas Barry, among others, to grant them a permit to use Chicago Park District facilities for a political rally during the week of the 1968 Democratic National Convention."

177.     *Slate v. McFetridge* is a relevant case because there like here, the city was giving a group the runaround, not complying with its own rules, and was not being timely.

178.     The *Slate v. McFetridge* court noted that a "licensing authority is granted a reasonable period to rule on a permit application largely because time is needed for negotiations and the making of arrangements for and with the applicant."

179.     The *Slate v. McFetridge* court regarding the delay and game playing "reprehensible" and this court should too.

180.     Incidentally, in footnote 2 of *Slate v. McFetridge*, there are as here, the defendants had a contrived conflict (they claimed only one park was available and the President was to speak there: that did not persuade the appellate court and it should not persuade this court.

181.     The organizers of Resist Marxism even offered to have their event later, and the locations of both events are not the same place—there is no real conflict.

182.     It is a made-up pretext that was not on the City of Boston's website and was not brought up in 3 discussions.

183.     The runaround is obviously because Resist Marxism (and the associated Boston Free Speech group) is a disfavored group.

184.     This type of giving disfavored the speakers the run around is unconstitional.

185.     "As soon as municipal officials are permitted to pick and choose, as they are in all existing socialist regimes, between those productions which are 'clean and healthful and culturally uplifting' in content and those which are not, the path is cleared

for a regime of censorship under which full voice can be given only to those views which meet with the approval of the power that be." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 563 (1975).

186.     The City of Boston had a duty to meet the 10 day requirement and not pull the rug out of the organizers of the rally by introduction of conflict with a road race that neither appeared on the website (though that was the practice), and was not mentioned during discussions between the organizers of the rally and city officials.

187.     The group (Resist Marxism) that is the sponsor of the November 19, 2007 event wanted a Saturday, and according to the website, every Saturday was booked, that was feasible before winter came and cold temperatures.

188.     Because the website indicated Saturday, November 18, 2017 was open, and because the personal they met with did not indicate that Saturday, November 18, 2017 would not work, the folks at Resist Marxism thought that day was available.

189.     Mark Sahady's Permit #9004109 from Boston Parks and Recreation.

190.     Mark Sahady called Citython (the people sponsoring the road race) and they said that their race would be over by around 10:00 AM and that they were having a brunch after the race which would be over 11:00 AM and was not near the bandstand. Mark Sahady continued to phone call and email with no answer. The event certainly was expected to end before noon.

191.     Member of Resist Marxism decided that they would go into the Parks department in person.

192.     One member of the Resist Marxism group went in alone a few times to talk.

Averred Complaint
and Request for Injunctive Relief (And Preliminary Injunction) - 41

193.        Mark Sahady himself went to the Parks department on October 18th.

194.        Mark Sahady and others from Resist Marxism talked to several

representatives including Christopher Cook who stated that he was the decision authority.

195.        Members of Resist Marxism arranged a meeting for October 16th to meet

with the Boston Police Department.

196.        Mark Sahady was not able to attend but Resist Marxism sent two other

people. Mark Sahady was told that the police Commissioner among other high ranking

city officials were there and they tried to convince Resist Marxism to cancel the Rally for

the Republic event.

197.        The event timeline is as follows:

   a.  September 18, 2017– Mr. Mark Sahady applied for a permit on the Boston Parks
and Recreation website for November 18th. The date was chosen because it was
available while other dates, such as November 4th and November 11th were not.

   b.  September 21, 2017– Mr. Mark Sahady received an email from Boston Parks and
Recreation requesting more information about the event which was responded to
on the same day. He also received an email from Paul McCaffrey and sent the
same response to his email.

   c.  Mr. Mark Sahady makes many calls and emails with no response.

   d.  October 3rd– After many attempts to contact the department finally received a call
from Lou Chianca. Mark Sahady and Lou Chianca of Boston Parks and
Recreation discussed moving the rally to another day but explained it would have
to be a Saturday. They went through all Saturdays for the same time period and
Lou Chianca said that they weren't available. Lou Chianca wanted Mark Sahady
to change the date to Sunday, November 19th. Mark Sahady of Resist Marxism
checked with the others, and sent Lou Chianca an email explaining it had to be a
Saturday. Since the bandstand was originally available for the November 18th
Resist Marxism stuck with that day.

e. October 4th – Mark Sahady sent an email to everyone involved explaining they were having a rally on the 18th and would continue working with the city on the permit.

f. "Sam" and "Matthias" of the Resist Fascism met with the Department of Parks and Recreation at least twice.

g. October 17th –Mark Sahady, Sam, and Matthias went to Boston Parks and Recreation and talked with Lou Chianca, Paul McCaffrey, and Commissioner of Parks and Recreation Christopher Cook. Mr. Mark Sahady agreed to meet with the Boston Police Department and Parks and Recreation the following week.

h. October 23rd – Sam and Matthias of Resist Marxism met with the Lou and Boston Police Commissioner William Evans in his office.

i. October 26th – Parks and Recreation sent a letter to Mr. Mark Sahady rejecting application.

j. November 4th – Refuse Fascism has an event on the bandstand even though that day wasn't' available on the website back in September.  According to the Boston Globe story "Scores gather for antifascism rally on Boston Common" of November 4, 2017, "Scores of protesters gathered at the Parkman Bandstand late Saturday afternoon to protest President Trump and the rise of what they described as fascism in the United States."  There appears to be viewpoint discrimination and a double standard.  "Refuse Fascism" had the favored speech and could book the Parkman Bandstand despite it being listed as "not available" that day on the city website, whereas "Resist Marxism" could not.  According to the Boston Globe, "**The group was issued a permit for the Boston event**, according to Nicole Caravella, a spokeswoman for Mayor Martin J. Walsh."

198.        Finally on October 26th Mark Sahady received an email stating that the permit was approved, but approximately ½ hour later Mark Sahady received another email stating that the permit was approved for November 19th and not November 18th.  This made the event impossible.

199.       Unfortunately members of our group had to plan during the city's obstinacy so travel arrangements and time off of work had already been arranged by speakers and other participants.

200.       Therefore it is too late to change the day of the event and it will proceed with or without a permit on November 18th

201.       The loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

202.       "A preliminary injunction should issue when the plaintiff has demonstrated a probability of success on the merits, and when First Amendment interests were either threatened or being impaired at the time such relief was sought and the loss of First Amendment freedoms, for even minimal periods of time, constituted irreparable injury." *Elrod v. Burns, 427 U.S. 347, 349 (1976). Accord, Mullins v. City of New York,* 634 F. Supp. 2d 373, 392 (S.D.N.Y. 2009) ("Thus deprivation of First Amendment rights directly results from defendants' actions. *In such cases plaintiffs are irreparably harmed -* - as is the public discourse protected by our nation's free speech guarantees. Therefore, plaintiffs have demonstrated irreparable harm to First Amendment interests sufficient to support a *preliminary injunction.*)

203.       "**It is well established that the loss of first amendment freedoms constitutes irreparable injury**." *Sindicato Puertorriqueño de Trabajadores v. Fortuño,* 699 F.3d 1, 15 (2012)

204.       "[T]o obtain a preliminary injunction, the plaintiffs must demonstrate that issuing an injunction "will promote (or, at least, not denigrate) the public interest. Protecting rights to free speech is *ipso facto* in the interest of the general public."

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,* 249 F. Supp. 2d 98, 128 (Fed. Dist. Mass. 2003).

205.     When the First Amendment is at stake, "quantification of injury is difficult and damages are therefore not an adequate remedy." *ACLU v. Alvarez,* 679 F.3d 583, 589 (7th Cir. 2012).

206.     "If the moving party establishes a likelihood of success on the merits, the balance of harms  normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU v. Alvarez,* 679 F.3d 583, 589-590 (7th Cir. 2012). So with city of Boston policies and a permitting process that is unconstitutional.

207.     Stated differently, "injunctions protecting First Amendment freedoms are always in the public interest." *ACLU v. Alvarez*, 679 F.3d 583, 590 (7TH Cir. 2012).

208.     Here the past treatment of me and the speakers at the Boston Speech Rally is patently unconstitutional.

209.     Moreover, as for the merits of the case the refusal to offer the Resist Marxism group on the day they planned to have the event, a date that was available on the website, a date wherein speakers had committed and made air flights and reserved hotel rooms, wherein others had taken days off from work, wherein press releases have gone out, wherein both the road race and the Rally Against Marxism are at different times and not in the same space though the same day, wherein the delays in granting a permit and the runaround was inexcusable, a preliminary injunction should issue.

210.     "A party who seeks a preliminary injunction must show: (1) that she has a substantial likelihood of success on the merits; (2) that she faces a significant potential

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

for irreparable harm in the absence of immediate relief; (3) that the ebb and flow of possible hardships are in favorable juxtaposition (i.e., that the issuance of an injunction will not impose more of a burden on the nonmovant than its absence will impose on the movant); and (4) that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest." *McGuire v. Reilly*, 260 F.3d 36, 42

211.        Accordingly:

a.  (1) I have shown a substantial likelihood of success on the merits because there is obviously a right to speak in public parks, especially when one has a permit, unmolested from the police. The case law is very clear that there is a right to sufficient amplification, effective speech, a right to be heard which includes a right to be heard by audience members and the press, and a right to assemble.

b.  (2) The case law is clear that one faces a significant potential for irreparable harm in the absence of immediate relief because the interruption of speech, even for a brief moment, is irreparable harm: "The loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury."

c.  (3) that the ebb and flow of possible hardships are in favorable juxtaposition (i.e., that the issuance of an injunction will not impose more of a burden on the nonmovant than its absence will impose on the movant); Here the case law is also clear—the public benefits from free speech, and there are no "hardships" associated with speech. Also, Boston doesn't have an interest in suppressing this speech—it doesn't conflict with the rally; and

d.  (4) that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest." There is always a public interest in free speech.

"Injunctions protecting First Amendment freedoms are always in the public

interest. *ACLU v. Alvarez,* 679 F.3d 583, 590 (7TH Cir. 2012)

*McGuire v. Reilly*, 260 F.3d 36, 42.

## RELIEF REQUEST 1:  REQUEST FOR A PRELIMINARY INJUNCTION

212.        The previous paragraphs are incorporated by reference.

213.        Is it moved that a preliminary injunction immediately be ordered against

the defendants ordering them to:

a.  Allow access to me and the Resist Marxism group and the Boston Free Speech

group to the Parkman Bandstand for Saturday, November 18, 2017, and order the

defendants to issue an event permit to Resist Marxism to its representative Mark

Sahady.

b.  Order the defendants to allow sound at Resist Marxism: Rally for the Republic of

sufficient volume to speak over protestors and be sufficiently heard, and to be as

loud as a concert quality sound system, and not be reduced to mere bullhorns.

c.  Order the defendants to allow the attendees of Resist Marxism: Rally for the

Republic who are attending the event, not protesting, and generally want to hear,

to be part of audience just outside the speakers.

d.  Order the defendants to allow the media to access Resist Marxism: Rally for the

Republic so that they can hear the speaker and have one on one conversations at

short range.

e. Order the defendant Commissioner of Police to not "back down" and leave plaintiff or speakers or audience members of Resist Marxism: Rally for the Republic to be unprotected.

214. Order the defendants to allow the members of Resist Marxism and Boston Free Speech Rally to determine who is and is not a speaker, and order the Boston Police and other defendants to not interfere with a speaker trying to speak or function as gatekeepers.

215. Order the defendants to allow the audience for the Resist Marxism Rally, certainly those that are not protesting the event and want to hear the speakers, to be around the speakers of the Resist Marxism: Battle for the Republic rally.

216. Order the defendants to allow the press to be near the Resist Marxism Rally, and to interview its participants.

## RELIEF REQUEST 2: REQUEST FOR PERMANENT INJUNCTIVE RELIEF

217. The previous paragraphs are incorporated by reference.

218. Order the defendants to not interfere with the press covering a rally or a protest or like speech again.

219. Order the defendants to not interfere with the press covering a rally or a protest or like speech *in which I am a participant* again.

220. Order the defendants to provide several dates for similar rallies next spring, summer and fall at the Parkman Bandstand so that I may be speak.

221.        Order the defendants to provide several dates for similar rallies next

spring, summer and fall at the Parkman Bandstand so that I may be speak.

222.        Order the defendants to provide several dates for similar rallies next

spring, summer and fall at the Parkman Bandstand so that I may be speak.

223.        Order the defendants to never separate non-protesting audience members

from the speakers against the speaker's wishes again.

224.        Order the defendants to never separate non-protesting audience members

from the speakers against the speaker's wishes again *when I am a speaker*.

225.        Order the defendants to allow speakers speaking in Boston parks sufficient

amplification so that they may be heard by their intended audience.

226.        Order the defendants to allow speakers speaking in Boston parks sufficient

amplification so that they may be heard by their intended audience *when I am a speaker*.

227.        Order the defendants to not interfere with designated speakers at permitted

events again.

228.        Order the defendants to not interfere with designated speakers at permitted

events again *when I am a speaker*, especially forbidding restraints as against myself.

229.        Order the defendant police not to "back down" and fail to provide

protection.

## RELIEF REQUEST 3: DAMAGES

230.        The previous paragraphs are incorporated by reference.

231.        I seek a $ 250 million dollars in actual damages from each defendant, $

250 dollars million in punitive damages, court costs, filing fees, attorney costs, any other

fees and expenses made necessary by this lawsuit including cost for stenographers.

232.        I also seek any other relief this court finds just and appropriate.

Submitted by himself, *pro se*,

Dated this November 7, 2017
PO Box 1082

Pittsfield, MA 01202-1082

RinaldoDelGallo@gmail.com

BBO 632880
(413) 445-6789